IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE RAIT FINANCIAL TRUST
SECURITIES LITIGATION

Master File No. 2:07-cv-03148-LDD

**MEMORANDUM OF LAW IN SUPPORT OF LEAD PLAINTIFF'S
MOTIONS FOR FINAL APPROVAL OF PROPOSED SETTLEMENT
AND FOR APPROVAL OF PROPOSED PLAN OF ALLOCATION**

**BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP**

Chad Johnson
Gerald H. Silk
John C. Browne
John Rizio-Hamilton
1285 Avenue of the Americas
New York, New York 10019
Tel: (212) 554-1400
Fax: (212) 554-1444

*Attorneys for Court-Appointed Lead Plaintiff Brahman
Capital Corp. and Lead Counsel for the Class*

December 3, 2009

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iii

I.    INTRODUCTION ................................................................. 1

II.    THE COURT SHOULD GRANT FINAL APPROVAL OF THE
SETTLEMENT .................................................................. 3

    A.    The Law Favors And Encourages Settlements ........................ 3

    B.    The Role Of The Court In Determining Whether To Approve A
Class Action Settlement .................................................. 3

    C.    The Standard For Approval Of Class Action Settlements ....................... 5

    D.    The Settlement Satisfies The *Girsh* Criteria ............................ 5

        1.    The Complexity, Expense And Likely Duration Of The
Litigation Support Approval Of The Settlement ......................... 6

        2.    The Class's Reaction To The Settlement Supports Approval
Of The Settlement ......................................................... 8

        3.    The Stage Of The Proceedings And The Amount Of
Discovery Completed Support Approval Of The Settlement ..................... 9

        4.    The Risks Of Establishing Liability Support Approval Of
The Settlement ......................................................... 10

        5.    The Risks Of Establishing Damages Support Approval Of
The Settlement ......................................................... 14

        6.    The Risks Of Maintaining the Class Action Through Trial
Support Approval Of The Settlement ....................................... 15

        7.    Defendants' Inability To Withstand A Greater Judgment
Supports Approval Of The Settlement ....................................... 15

        8.    The Reasonableness Of The Settlement In Light Of The
Best Possible Recovery And The Attendant Risks Of
Litigation Support Approval Of The Settlement ......................... 18

    E.    Based On The *Girsh* Factors And The Totality Of The
Circumstances, The Settlement Is Fair, Reasonable And Adequate ....................... 19

III.   THE PROPOSED PLAN OF ALLOCATION SHOULD BE APPROVED.....................20

       A.    The General Standard For Approving A Plan Of Allocation ...............................20

       B.    The Proposed Plan Of Allocation Is Fair And Reasonable And
             Warrants Approval By The Court.........................................................................22

IV.    NOTICE TO THE CLASS SATISFIED THE REQUIREMENTS OF
       RULE 23 AND DUE PROCESS ......................................................................................23

V.     CONCLUSION.................................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Bell Atl. Corp. v. Bolger*,
    2 F.3d 1304 (3d Cir. 1993)...................................................................................4

*Bryan v. Pittsburgh Plate Glass Co.*,
    494 F.2d 799 (3d Cir. 1974)..............................................................................3, 4

*Cullen v. Whitman Med. Corp.*,
    197 F.R.D. 136 (E.D Pa. 2000)........................................................................4, 19

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005)............................................................................................13

*Eichenholtz v. Brennan*,
    52 F.3d 478 (3d Cir. 1995)....................................................................................3

*Eisen v. Carlisle & Jacquelin*,
    417 U.S. 156 (1974)............................................................................................24

*Girsh v. Jepson*,
    521 F.2d 153 (3d Cir. 1975)......................................................................5, 18, 19

*In re 2007 Novastar Fin. Inc., Sec. Litig.*,
    No. 07-0139, 2008 WL 2354367 (W.D. Mo. June 4, 2008), *aff'd*, 579 F.3d 878
    (8th Cir. 2009)....................................................................................................12

*In re Aetna Inc. Sec. Litig.*,
    No. Civ.A. MDL 1219, 2001 WL 20928 (E.D. Pa. Jan. 4, 2001).....................12, 14

*In re Am. Bank Note Holographics, Inc. Sec. Litig.*,
    127 F. Supp. 2d 418 (S.D.N.Y. 2001).................................................................21

*In re Am. Bus. Fin. Servs. Inc. Noteholder Litig.*,
    No. 05-232, 2008 WL 4974782 (E.D. Pa. Nov. 21, 2008) ............................. *passim*

*In re Auto. Refinishing Paint Antitrust Litig.*,
    617 F. Supp. 2d 336 (E.D. Pa. 2007) .................................................................10

*In re Cell Pathways, Inc. Sec. Litig. II*,
    No. 01-CV-1189, 2002 WL 31528573 (E.D. Pa. Sept. 23, 2002) .........................8, 16, 19, 21

*In re Cendant Corp. Litig.*,
    264 F.3d 201 (3d Cir. 2001).......................................................................... *passim*

*In re Cendant Corp. Sec. Litig.*,
  109 F. Supp. 2d 235 (D.N.J. 2000), *aff'd in relevant part*, 264 F.3d 201 (3d
  Cir. 2001) ...........................................................................................................21

*In re Cigna Corp. Sec. Litig.*,
  No. 02-8088, 2007 WL 2071898 (E.D. Pa. July 13, 2007) ....................................3, 10, 13, 20

*In re Cmty. Bank of N. Va.*,
  MDL No. 1674, 2008 WL 3833271 (W.D. Pa. Aug. 15, 2008) .............................................20

*In re Corel Corp. Sec. Litig*,
  293 F. Supp. 2d 484 (E.D. Pa. 2003) .............................................................................12, 14

*In re Datatec Sys., Inc. Sec. Litig.*,
  No. 04-CV-525 (GEB), 2007 WL 4225828 (D.N.J. Nov. 28, 2007)......................................22

*In re EVCI Career Colls. Holding Corp.*,
  No. 05 Civ 10240, 2007 WL 2230177 (S.D.N.Y. July 27, 2007) ....................................21, 23

*In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
  55 F.3d 768 (3d Cir. 1995)..........................................................................................3, 5, 7, 18

*In re Genta Sec. Litig,.*
  No. 04-2123 (JAG), 2008 WL 2229843 (D.N.J. May 28, 2008).........................................4, 14

*In re Gilat Satellite Networks*, *Ltd.*,
  No. CV-02-1510, 2007 WL 1191048 (E.D.N.Y. Apr. 19, 2007) .............................................6

*In re GNC S'holder Litig.*,
  668 F. Supp. 450 (W.D. Pa. 1987).........................................................................................11

*In re Greenwich Pharm. Sec. Litig.*,
  Civ. A. No. 92-3071, 1995 WL 251293 (E.D. Pa. Apr. 26, 1995) ..............................14, 15, 18

*In re Ikon Office Solutions, Inc. Sec. Litig.*,
  194 F.R.D. 166 (E.D. Pa. 2000)........................................................................... *passim*

*In re Ins. Brokerage Antitrust Litig.*,
  MDL No. 1663, 2009 WL 411877 (D.N.J. Feb. 17, 2009)....................................................23

*In re Lucent Techs., Inc. Sec. Litig.*,
  307 F. Supp. 2d 633 (D.N.J. 2004) ........................................................................12, 21, 23

*In re Luxottica Group S.p.A Sec. Litig.*,
  233 F.R.D. 306, 310 (E.D.N.Y. 2006) .....................................................................................6

*In re PaineWebber Ltd. P'ships Litig.*,
  171 F.R.D. 104 (S.D.N.Y.), *aff'd*, 117 F.3d 721 (2d Cir. 1997)............................................21

iv

*In re Prudential Ins. Co. of Am. Sales Practices Litig.*,
  148 F.3d 283 (3d Cir. 1998)............................................................................ *passim*

*In re Ravisent Techs., Inc. Sec. Litig.*,
  No. 00-CV-1014, 2005 WL 906361 (E.D. Pa. Apr. 18, 2005)......................................8, 16, 17

*In re Remeron Direct Purchaser Antitrust Litig.*,
  No. Civ. 03-0085 FSH, 2005 WL 3008808 (D.N.J. Nov. 9, 2005) ..........................................4

*In re Res. Am. Sec. Litig.*,
  202 F.R.D. 177 (E.D. Pa. 2001)............................................................................15

*In re Rite Aid Corp. Sec. Litig.*,
  146 F. Supp. 2d 706 (E.D. Pa. 2001) ......................................................................18

*In re Safety Components, Inc. Sec. Litig.*,
  166 F. Supp. 2d 72 (D.N.J. 2001) ..........................................................................17

*In re SFBC Int'l Inc. Sec. & Derivative. Litig.*,
  310 Fed. Appx. 556 (3d Cir. 2009).........................................................................17

*In re SmithKline Beckman Corp. Sec. Litig.*,
  751 F. Supp. 525 (E.D. Pa. 1990) ..................................................................9, 11, 15

*In re Suprema Specialties, Inc. Sec. Litig.*,
  No. 02-168, 2008 WL 906254 (D.N.J. March 31, 2008)......................................................21

*In re Unisys Corp. Retiree Med. Benefits Litig.*,
  No. 969, 2003 WL 252106 (E.D. Pa. Feb. 4, 2003) ........................................................15

*In re Veeco Instruments, Inc. Sec. Litig.*,
  No. 05 MDL 01695, 2007 WL 4115809 (S.D.N.Y. Nov. 7, 2007) ............................................21

*In re Vicuron Pharms., Inc. Sec. Litig.*,
  512 F. Supp. 2d 279 (E.D. Pa. 2007) ...............................................................3, 8, 11

*In re Warfarin Sodium Antitrust Litig.*,
  391 F.3d 516 (3d Cir. 2004)........................................................................3, 4, 5

*In re WorldCom, Inc. Sec. Litig.*,
  388 F. Supp. 2d 319 (S.D.N.Y. 2005)......................................................................21

*Kline v. Sec. Guards, Inc.*,
  196 F.R.D. 261 (E.D. Pa. 2000)............................................................................15

*Lachance v. Harrington*,
  965 F. Supp. 630 (E.D. Pa. 1997) ..........................................................................4

*Luminent Mortg. Capital, Inc. v. Merrill Lynch & Co.*,
    No. 07-5423, 2009 WL 2590087 (E.D. Pa. Aug. 20. 2009) ..................................................13

*Maley v. Del Global Techs. Corp.*,
    186 F. Supp. 2d 358 (S.D.N.Y. 2002) ..................................................................................21

*New York State Teachers' Ret. Sys. v. Fremont Gen. Corp.*,
    No. 2:07-cv-5756, 2009 WL 3112574 (C.D. Cal. Sept. 25, 2009) ........................................12

*Newman v. Stein*,
    464 F.2d 689 (2d Cir. 1972) ................................................................................................3

*Smith v. Dominion Bridge Corp.*,
    No. 96-7580, 2007 WL 1101272 (E.D. Pa. Apr. 11, 2007) ............................................ *passim*

*Stoetzner v. U.S. Steel Corp.*,
    897 F.2d 115 (3d Cir. 1990) ................................................................................................8

*Strube v. Am. Equity Inv. Life Ins.* Co., 226 F.R.D 688, 698 (M.D. Fla. 2005) ..............................6

*Walsh v. Great Atl. & Pac. Tea Co.,*
    726 F.2d 956 (3d Cir. 1983) ..............................................................................................20

*Weiss v. Mercedes-Benz of N. Am., Inc.*,
    899 F. Supp. 1297 (D.N.J.), *aff'd*, 726 F.2d 956 (3d Cir. 1995) ..........................................10

## STATUTES & RULES

Private Securities Litigation Reform Act of 1995 .............................................................................2

Fed. R. Civ. P. 23 ...................................................................................................................5, 15, 24

## OTHER AUTHORITY

Ellen M. Ryan & Laura E. Simmons, *Securities Class Action Settlements: 2008*
    *Review and Analysis* (2009), *available at* http://securities.stanford.edu/
    Settlements/REVIEW_1995-2008/Settlements_Through_12_2008.pdf. ..............................18

Lead Plaintiff Brahman Capital Corp. ("Brahman" or "Lead Plaintiff") respectfully submits this memorandum of law in support of its motion for final approval of the proposed settlement of the above-captioned action (the "Action") entered into by and among Lead Plaintiff and the Settling Defendants.[1]  Lead Plaintiff also submits this memorandum of law in support of its motion for approval of the proposed Plan of Allocation of the settlement proceeds.

## I.    INTRODUCTION

As explained more fully herein, Lead Plaintiff and Lead Counsel have succeeded in obtaining an excellent recovery for the benefit of the Class[2] in the amount of $32,000,000 in cash (the "Settlement Amount"), as embodied in the Stipulation and Agreement of Settlement filed

---

[1]   The Settling Defendants are: Defendants RAIT Financial Trust ("RAIT" or the "Company"), Betsy Z. Cohen, Daniel G. Cohen, Ellen J. DiStefano, Jack E. Salmon, Edward S. Brown, Frank A. Farnesi, S. Kristin Kim, Arthur Makadon, Daniel Promislo, John F. Quigley III, Murray Stempel III, Friedman, Billings, Ramsey Group, Inc., FBR Capital Markets Corp., Bear, Stearns & Co. Inc., UBS Securities LLC, RBC Capital Markets Corporation, KeyBanc Capital Markets, Stifel, Nicolaus & Company, Inc., BMO Capital Markets Corp., Piper Jaffray & Co., and RBC Dain Rauscher (n/k/a RBC Capital Markets Corporation).

[2]   In its Order Preliminarily Approving Settlement and Setting Settlement Hearing dated September 4, 2009 (the "Preliminary Approval Order"), the Court certified for purposes of effectuating the Settlement, a Class consisting of:

all persons and entities that acquired the securities of RAIT during the period from June 8, 2006 through August 3, 2007, inclusive, including securities purchased in the January 2007 Common Stock Offering, the July 2007 Preferred Stock Offering, and the April 2007 Note Offering, and who suffered damages as a result.  Excluded from the Class are (i) Defendants; (ii) members of the immediate families of the Individual Defendants; (iii) the subsidiaries and affiliates of the Defendants; (iv) any person or entity who is a partner, executive officer, director, trustee, or controlling person of RAIT or Taberna or of any other Defendant (including any of their subsidiaries or affiliates); (v) any entity in which any Defendant has a controlling interest; (vi) the Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof; and (vii) the legal representatives, heirs, successors and assigns of any such excluded party. Also excluded from the Class are any persons who exclude themselves by filing a request for exclusion in accordance with the requirements set forth in the Notice.

Preliminary Approval Order ¶ 2.

with the Court on July 15, 2009 (the "Settlement Agreement").[3]  The Settlement was negotiated under the auspices of a highly-regarded mediator, the Hon. Layn R. Phillips (Ret.), and is the product of intense and arms'-length negotiations.  *See* Lead Counsel Decl. ¶¶ 3-4.  The Settlement is especially notable given the legal risks faced by the Class, as well as the substantial concern regarding the Company's ability to satisfy an adverse verdict if the Class were successful in proving its claims.  *Id.* ¶¶ 65-66.  The Settlement was reached only after Lead Plaintiff conducted an extensive legal and factual investigation of the claims asserted in the Consolidated Class Action Complaint (the "Complaint"), including through the review of approximately 1.15 million pages of core documents produced by Defendants.  *Id.* ¶¶ 6, 22, 62.

The Court-appointed Lead Plaintiff, a sophisticated institutional investor of the type favored by Congress when passing the Private Securities Litigation Reform Act of 1995 ("PSLRA"), has actively monitored the prosecution of this litigation and Lead Counsel's settlement efforts on behalf of the Class, and fully recommends that the Settlement and Plan of Allocation be approved.  *See* Declaration of Peter A. Hochfelder, President of Lead Plaintiff Brahman Capital Corp. (the "Hochfelder Declaration" or "Hochfelder Decl.") ¶¶ 4-7, 10 (attached as Exhibit 2 to the Lead Counsel Declaration).

---

[3]   Lead Plaintiff is simultaneously submitting the Declaration of Chad Johnson and John C. Browne in Support of Lead Plaintiff's Motions for Final Approval of Proposed Settlement and for Approval of Proposed Plan of Allocation and Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses (the "Lead Counsel Declaration" or "Lead Counsel Decl.").  The Lead Counsel Declaration and the exhibits thereto are an integral part of this submission and the Court is respectfully referred to it for a detailed description of, *inter alia*, the history of the Action through the submission of the Settlement to the Court; the nature of the claims asserted in the Action; the investigation undertaken in the Action; the negotiations leading to the Settlement; the value of the Settlement to the Class, as compared to the risks and uncertainties of continued litigation; the terms of the Plan of Allocation of the Settlement proceeds; and a description of the services Plaintiffs' Counsel provided for the benefit of the Class.  Unless otherwise noted, capitalized terms herein shall have the meanings ascribed to them in the Lead Counsel Declaration and in the Settlement Agreement.

## II.    THE COURT SHOULD GRANT FINAL APPROVAL OF THE SETTLEMENT

### A.    The Law Favors And Encourages Settlements

There is a strong judicial policy in this Circuit favoring the settlement of disputed claims before trial, particularly in class actions and other complex litigation. *See In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 535 (3d Cir. 2004) ("there is an overriding public interest in settling class action litigation"); *In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 784 (3d Cir. 1995) ("The law favors settlement, particularly in class actions and other complex cases . . . ."); *Eichenholtz v. Brennan*, 52 F.3d 478, 486 (3d Cir. 1995) ("the settlement of complex litigation before trial is favored by the federal courts"). Settlement of complex class action litigation conserves substantial judicial resources, avoids the expense of prolonged litigation, and provides the prompt resolution of disputes that could otherwise linger for years. *See General Motors*, 55 F.3d at 784; *In re Cigna Corp. Sec. Litig.*, No. 02-8088, 2007 WL 2071898, at *3 (E.D. Pa. July 13, 2007); *In re Vicuron Pharms., Inc. Sec. Litig.*, 512 F. Supp. 2d 279, 284 (E.D. Pa. 2007).

### B.    The Role Of The Court In Determining Whether
To Approve A Class Action Settlement

The issue before the Court is whether the proposed settlement is within a "range of reasonableness" that an informed lead plaintiff, advised by experienced attorneys, could accept in light of the relevant risks of the litigation. *General Motors*, 55 F.3d at 806; *see also Bryan v. Pittsburgh Plate Glass Co.*, 494 F.2d 799, 801 (3d Cir. 1974); *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972); *In re Am. Bus. Fin. Servs. Inc. Noteholder Litig.*, No. 05-232, 2008 WL 4974782 at *5 (E.D. Pa. Nov. 21, 2008). While the court must examine the fairness of a proposed settlement, it should recognize that a settlement by its very nature is a compromise and should avoid turning the fairness inquiry into a full-fledged trial on the merits. *See In re Prudential Ins.*

3

*Co. of Am. Sales Practices Litig.*, 148 F.3d 283, 316-17 (3d Cir. 1998); *Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1315 (3d Cir. 1993); *Bryan*, 494 F.2d at 801; *In re Remeron Direct Purchaser Antitrust Litig.*, No. Civ. 03-0085 FSH, 2005 WL 3008808, at *4 (D.N.J. Nov. 9, 2005); *In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166, 179 (E.D. Pa. 2000).

In determining whether a given settlement is reasonable, the opinion of experienced counsel is entitled to considerable weight. *See, e.g., Smith v. Dominion Bridge Corp.*, No. 96-7580, 2007 WL 1101272, at *6 (E.D. Pa. Apr. 11, 2007); *Cullen v. Whitman Med. Corp.*, 197 F.R.D. 136, 145 (E.D Pa. 2000); *Lachance v. Harrington*, 965 F. Supp. 630, 638 (E.D. Pa. 1997) (courts should "give credence to the estimation of the probability of success proffered by class counsel").

Indeed, in the Third Circuit, a presumption of fairness attaches to a settlement when "(1) the settlement negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected." *Warfarin*, 391 F.3d at 535; *see In re Cendant Corp. Litig.*, 264 F.3d 201, 232 n.18 (3d Cir. 2001); *In re Genta Sec. Litig,.* No. 04-2123 (JAG), 2008 WL 2229843, at *2 (D.N.J. May 28, 2008). Here, the Class overwhelmingly supports the Settlement – indeed, not a single institutional investor has objected to the proposed Settlement.[4] Moreover, Lead Counsel has conducted an extensive investigation into the alleged misconduct and there has been sufficient discovery to allow an informed assessment of the risks of continued litigation. Finally, the Settlement was reached through vigorous arms'-length negotiations between experienced counsel

---

[4] As discussed more fully in the Lead Counsel Declaration, we recently received (approximately two weeks after the objection deadline had passed) two separate letters from a single individual investor commenting on certain aspects of the Settlement. *See* Lead Counsel Decl. ¶ 13. For the reasons discussed in the Lead Counsel Declaration, these letters – neither of which are styled as "objections" – do not provide any basis for modifying the Settlement in any way. *See id.*

facilitated by a highly experienced retired judge serving as the settlement mediator and is fully supported by a sophisticated institutional investor appointed by the Court as Lead Plaintiff. These factors create a strong presumption that the Settlement negotiated by the parties is fair and reasonable. *See Warfarin*, 391 F.3d at 535.

C.    **The Standard For Approval Of Class Action Settlements**

The legal standard for reviewing a proposed settlement of a class action is whether the proposed settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2); *see also Cendant*, 264 F.3d at 231; *Prudential*, 148 F.3d at 316; *General Motors*, 55 F.3d at 785. In *Girsh v. Jepson*, 521 F.2d 153 (3d Cir. 1975), the Third Circuit set out the following non-exhaustive factors for district courts to consider in determining whether to approve a proposed settlement of a class action:

> (1) the complexity, expense and likely duration of the litigation . . .; (2) the reaction of the class to the settlement . . . ; (3) the stage of the proceedings and the amount of discovery completed . . . ; (4) the risks of establishing liability . . . ; (5) the risks of establishing damages . . . : (6) the risks of maintaining the class action through the trial . . . ; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery . . . ; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all of the attendant risks of litigation . . . .

521 F.2d at 157 (citations omitted); *see also Warfarin*, 391 F.3d at 534-35; *Cendant*, 264 F.3d at 231-32; *Prudential*, 148 F.3d at 317; *General Motors*, 55 F.3d at 785. "These factors are a guide and the absence of one or more does not automatically render the settlement unfair. Rather, the court must look at all the circumstances of the case and determine whether the settlement is within the range of reasonableness under *Girsh*." *Am. Bus. Fin. Servs.*, 2008 WL 4974782, at *5 (internal quotation and citations omitted).

D.    **The Settlement Satisfies The *Girsh* Criteria**

As demonstrated below, each of the nine *Girsh* factors supports approval of the Settlement.

5

1.    **The Complexity, Expense And Likely Duration Of The Litigation Support Approval Of The Settlement**

There is no doubt that this securities class action involves complex factual and legal issues.  Courts have acknowledged the "overriding public interest in favor of settlement" of class actions because it is "common knowledge that class action suits have a well deserved reputation as being most complex."  *Strube v. Am. Equity Inv. Life Ins. Co*., 226 F.R.D 688, 698 (M.D. Fla. 2005) (citation and internal quotations omitted).  "Securities class actions are generally complex and expensive to prosecute," *In re Gilat Satellite Networks*, *Ltd*., No. CV-02-1510, 2007 WL 1191048, at *10 (E.D.N.Y. Apr. 19, 2007), and "[c]lass action suits readily lend themselves to compromise because of the difficulties of proof, the uncertainties of the outcome, and the typical length of the litigation." *In re Luxottica Group S.p.A Sec. Litig*., 233 F.R.D. 306, 310 (E.D.N.Y. 2006).

This complex litigation has been and would have continued to be vigorously litigated.  As set forth in detail in the Lead Counsel Declaration, Defendants filed four separate motions to dismiss the Complaint, the briefing of which included several supplemental briefs filed by Defendants regarding new authority in support of their motions to dismiss.  *See* Lead Counsel Decl. ¶¶ 35-41.  Thereafter, certain of the Defendants sought leave to file an interlocutory appeal reviewing the Court's denial of the motion to dismiss.  *Id*. ¶ 44.   In addition, Defendants vigorously contended that they were not liable for securities fraud, but instead were themselves victims of an unprecedented and unforeseen collapse in the real estate market.  Throughout this case, Defendants would have raised numerous fact-intensive defenses involving complex concepts such as the proper application of GAAP and the structures and terms of the securities underlying RAIT's investment portfolio.

In the absence of the Settlement, Lead Plaintiff would have had to overcome these numerous hurdles in order to achieve a post-trial verdict of more than $32 million. First, this case would have required extensive additional discovery. At the time an agreement in principle was reached, formal discovery had just begun. However, in connection with confirmatory discovery conducted in this case, RAIT produced to Lead Plaintiff more than 1.15 million pages of documents relevant to Lead Plaintiff's claims. *See* Lead Counsel Decl. ¶ 62. A litigated discovery process would have been costly and extensive.

In addition, contested motions for class certification and summary judgment would have required substantial additional time and resources. Given the technical nature of the alleged misrepresentations regarding complex structured financial instruments and GAAP principles, extensive use of costly expert witnesses would have been necessary on issues such as the subprime market, accounting standards, loss causation, and the calculation of damages. At each of these stages, Defendants' Counsel would have pressed to narrow the scope of the claims to be tried and the potentially recoverable damages. Any eventual trial would have entailed vigorously contested pre-trial and *in limine* motions, and involved the introduction of hundreds of exhibits and numerous fact and expert witnesses.

Finally, whatever the outcome of any eventual trial, it is virtually certain that appeals would be taken from any verdict. All of the foregoing would delay the ability of the Class to recover **for years** — assuming, of course, that Lead Plaintiff was ultimately successful on its claims at trial, and assuming that Defendants would be able to satisfy a judgment obtained at trial. It is apparent that the "probable costs, in both time and money, of continued litigation" would be very high and, thus, this factor weighs strongly in favor of the Settlement. *General Motors*, 55 F.3d at 812 (internal quotation marks and citation omitted); *see also Am. Bus. Fin. Servs.*, 2008

WL 4974782, at *6; *In re Ravisent Techs., Inc. Sec. Litig.*, No. 00-CV-1014, 2005 WL 906361, at

*7 (E.D. Pa. Apr. 18, 2005); *Ikon*, 194 F.R.D. at 179.   Settlement at this time unequivocally

avoids this substantial, continued and uncertain litigation, and provides an immediate and

significant pecuniary recovery to members of the Class.

> **2.    The Class's Reaction To The Settlement**
> **Supports Approval Of The Settlement**

The date for Class Members to file requests to be excluded from the Class or objections to

the proposed Settlement was November 17, 2009.   Pursuant to the Preliminary Approval Order,

more than 79,000 Notices have been mailed to potential Class Members and a Summary Notice of

the proposed Settlement was published on October 7, 2009 in the national edition of *The Wall*

*Street Journal* and over the *PR Newswire*.   *See* Affidavit of Stephen J. Cirami Regarding (A)

Mailing of the Notice and Proof of Claim; (B) Publication of the Summary Notice; and (C)

Report on Requests for Exclusion ("Cirami Aff.") ¶¶ 2-8 (attached as Exhibit 3 to Lead Counsel

Declaration).   To date, not a single institutional investor has objected to the Settlement and a mere

eight (8) requests for exclusion, of which three indicate that they are not from Class Members,

have been received. *See* Lead Counsel Decl. ¶¶ 80, 101; Cirami Aff. ¶ 11.

The fact that the Class's reaction to the proposed Settlement is overwhelmingly positive is

strong evidence that the Settlement is fair, adequate, and in the best interests of the Class.   *See*

*Cendant*, 264 F.3d at 235 ("The vast disparity between the number of potential class members

who received notice of the Settlement and the number of objectors creates a strong presumption . .

. in favor of the Settlement . . ."); *see also Stoetzner v. U.S. Steel Corp.*, 897 F.2d 115, 118-19 (3d

Cir. 1990); *Vicuron Pharms.*, 512 F. Supp. 2d at 285 n.2; *Dominion Bridge*, 2007 WL 1101272, at

*4; *In re Cell Pathways, Inc. Sec. Litig. II*, No. 01-CV-1189, 2002 WL 31528573, at *4-*5 (E.D.

Pa. Sept. 23, 2002); *In re SmithKline Beckman Corp. Sec. Litig.*, 751 F. Supp. 525, 530 (E.D. Pa. 1990).

### 3.    The Stage Of The Proceedings And The Amount Of Discovery Completed Support Approval Of The Settlement

The Settlement was reached after the Court had ruled on and substantially denied Defendants' four heavily briefed motions to dismiss and denied motions for interlocutory appeal and entry of partial final judgment.  *See* Lead Counsel Decl. ¶¶ 35-47.  Although the formal discovery process was in its early stages when the parties reached an agreement in principle to settle, Lead Plaintiff and Lead Counsel had obtained substantial information about the facts and circumstances underlying the claims set forth in the Complaint such that they were able to make an informed judgment about the strengths of these claims and Defendants' potential defenses.[5]  In addition, when formal discovery began in February 2009, Lead Counsel obtained and analyzed a significant set of internal RAIT and Taberna documents, including the report of RAIT's SLC and the appendix of over 150 exhibits on which that report was based.  *See id*. ¶ 49.  These documents were supplemented and amplified through the mediation process, where the parties exchanged lengthy mediation statements and made presentations regarding their views of the case, the ability of RAIT to pay a judgment, and the applicable legal and factual issues.  Prior to agreeing to the

---

[5] As noted in the Lead Counsel Declaration, through its diligent prosecution of the case, Lead Counsel: (i) conducted an extensive factual investigation into the events and circumstances underlying the claims asserted in the Complaint, which included the review of SEC filings, press releases, conference calls, news articles and analysts' reports to identify all public statements made by Defendants and to obtain information concerning the collapse of the subprime market; (ii) investigated and uncovered the identities of 11 of RAIT's troubled borrowers, determined the amount of loans that RAIT had extended to certain of those borrowers, and analyzed those borrowers' financial condition on a quarterly basis throughout the Class Period; (iii) retained and consulted with experts in areas such as forensic accounting and damages; (iv) thoroughly researched the law relating to the claims against Defendants and potential defenses thereto; and (v) located and interviewed numerous former RAIT employees who were familiar with the subject matter of the Action.  *See* Lead Counsel Decl. ¶ 22.

Settlement, Lead Plaintiff obtained additional important discovery pursuant to which approximately 1.15 million pages of internal documents were reviewed. *See id*. ¶¶ 61-63.

Consequently, prior to entering into the Settlement Agreement, Lead Plaintiff and Lead Counsel had gathered sufficient information to make an informed judgment about the strengths and risks of Lead Plaintiff's claims and the Defendants' defenses. *See Prudential*, 148 F.3d at 319 (class counsel's use of informal discovery provided the information plaintiffs needed to appreciate the potential merits of the case); *see also Cendant*, 264 F.3d at 235-36. Furthermore, at the conclusion of the confirmatory discovery process, Lead Plaintiff and Lead Counsel determined that, while they still believed that the claims in the Complaint had merit, the risks they perceived when negotiating the Settlement, described below in detail, were well grounded.

### 4. The Risks Of Establishing Liability Support Approval Of The Settlement

In assessing the fairness of the Settlement, the Court must balance the benefits afforded the Class, including the immediacy and certainty of a substantial recovery, against the risks of establishing liability and damages through continuing litigation. *See Prudential*, 148 F.3d at 319; *Dominion Bridge*, 2007 WL 1101272, at *5. In considering this factor, the Court must bear in mind that "the risks surrounding a trial on the merits are always considerable," *Weiss v. Mercedes-Benz of N. Am., Inc.*, 899 F. Supp. 1297, 1301 (D.N.J.), *aff'd*, 726 F.2d 956 (3d Cir. 1995), and that "no matter how confident one may be of the outcome of litigation, such confidence is often misplaced." *In re Auto. Refinishing Paint Antitrust Litig.*, 617 F. Supp. 2d 336, 343 (E.D. Pa. 2007) (citation omitted).

Lead Counsel believes that Lead Plaintiff and the Class had a reasonably strong liability case against Defendants. Nevertheless, Lead Counsel recognizes that a finding of liability is by no means certain in a complex securities case such as this one. *See Cigna*, 2007 WL 2071898, at

*3; *Vicuron Pharms.,* 512 F. Supp. 2d at 284-85; *SmithKline Beckman*, 751 F. Supp. at 529; *In re GNC S'holder Litig.*, 668 F. Supp. 450, 451 (W.D. Pa. 1987).

For instance, there were facts specific to this Action which posed unique challenges to Lead Plaintiff's claims:

- No government agency filed charges against RAIT or any of the Defendants relating to the alleged wrongdoing at issue in this case. Rather, the SEC conducted a brief investigation and declined to pursue any claims against the Company;

- Neither the SEC nor RAIT's auditors required RAIT to restate any of the financial statements it issued during the Class Period; and

- An investigation commissioned by RAIT's Trustees concluded there was no wrongdoing at the Company.

*See* Lead Counsel Decl. ¶ 68.

Moreover, there were a number of legal risks that presented potentially substantial hurdles to the Class's ability to prevail on all or parts of the claims asserted in this Action. With respect to claims under Section 10(b) of the Exchange Act, the Class would have borne the burden of proving, *inter alia*, that: (i) the Defendants made materially false statements; (ii) the Defendants acted with *scienter*; and (iii) the disclosure of the falsity of those statements caused damages to the Class. Establishing all of these elements, especially within the context of a subprime-related action such as this one, would have been difficult or uncertain.

For example, Defendants would have argued that none of the alleged misrepresentations in the Complaint were materially false. Defendants would have presented evidence that their representations about RAIT's risk exposures, GAAP compliance, credit underwriting, and credit monitoring were true when they were made because the collapse of the subprime market occurred rapidly and unexpectedly in the summer of 2007, and because none of the Company's borrowers had actually defaulted until July 31, 2007. *See* Lead Counsel Decl. ¶ 70. In addition, Defendants

11

would have presented evidence that RAIT had accurately represented the extent of its exposure to subprime-related companies. *See id.* ¶ 71. Based in part on the rapidity of the subprime collapse, several securities class actions asserting subprime-related claims have been dismissed for failing to plead the falsity of the alleged misstatements. *See, e.g., In re 2007 Novastar Fin. Inc., Sec. Litig.*, No. 07-0139, 2008 WL 2354367 (W.D. Mo. June 4, 2008), *aff'd*, 579 F.3d 878 (8th Cir. 2009); *New York State Teachers' Ret. Sys. v. Fremont Gen. Corp.*, No. 2:07-cv-5756, 2009 WL 3112574, at *12-13 (C.D. Cal. Sept. 25, 2009).

Likewise, Defendants would have vigorously argued that, to the extent they made any false statements, they lacked *scienter*. Defendants would have argued to a jury that they were suddenly confronted with the precipitous collapse of the subprime sector, and their actions and statements within that rapidly-shifting context were consistent with mere negligence or mismanagement rather than any intent to deceive. *See, e.g., NovaStar*, 2008 WL 2354367, at *4 (holding that defendants' actions and statements with respect to sub-prime exposure were "more consistent with a company and executives confronting a deterioration in the business and finding itself unable to prevent it than they are with a company and executives recklessly deceiving the investing community"). These arguments may have been successful in persuading a jury that Defendants did not act with an intent to commit securities fraud, but were merely caught up in a nearly unprecedented market disruption. This uncertainty in establishing *scienter* strongly supports the reasonableness of the Settlement. *See Dominion Bridge*, 2007 WL 1101272, at *5; *In re Lucent Techs., Inc. Sec. Litig.*, 307 F. Supp. 2d 633, 645 (D.N.J. 2004); *In re Corel Corp. Sec. Litig*, 293 F. Supp. 2d 484, 492 (E.D. Pa. 2003); *In re Aetna Inc. Sec. Litig.*, No. Civ.A. MDL 1219, 2001 WL 20928, at *9 (E.D. Pa. Jan. 4, 2001); *Ikon*, 194 F.R.D. at 181-82.

Finally, Defendants could also be expected to raise an attack on the Class's ability to establish "loss causation." In advancing this argument, Defendants would have relied on, among other things, the Supreme Court's decision in *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005), which requires a plaintiff in a securities class action to plead and prove a "causal link" between the alleged corrective disclosures and the loss suffered by the Class. Defendants would have argued that the losses to the Class, including the declines in RAIT's stock price following the disclosures on July 31, August 2, and August 3, 2007, were caused by market-wide phenomena stemming from the sudden collapse of the subprime sector that caused the entire real estate industry to decline. *See, e.g., Luminent Mortg. Capital, Inc. v. Merrill Lynch & Co.*, No. 07-5423, 2009 WL 2590087, at *15-*16 (E.D. Pa. Aug. 20. 2009) (holding that, in the subprime context, "when the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors . . . the prospect that the plaintiff's loss was caused by the fraud decreases," and concluding that "the market downturn in the mortgage industry that developed in early-to mid-2007, is sufficient to undermine the inference of a nexus between Defendants' misrepresentations and the performance of the" securities) (internal quotation marks and citation omitted). While Lead Plaintiff would have attempted to prove that each of the price declines was attributable to the alleged fraud, proving loss causation, which would be an issue to be addressed by experts on both sides, could have been difficult for Lead Plaintiff at summary judgment or at trial. *See In re Cigna*, 2007 WL 2071898, at *3; *Dominion Bridge*, 2007 WL 1101272, at *5.

If Defendants had been successful, even in part, in advancing these arguments, the consequences to the Class's claims and recoverable damages could have been substantial. Any conclusion by the Court on summary judgment or by a jury after trial that Defendants' statements were not materially false, or that Defendants acted negligently rather than with intent to deceive,

would have severely curtailed or eliminated Defendants' liability.  Further, any decline in the price of RAIT securities that was not directly linked to the "corrective disclosures" alleged in the Complaint would not have been recoverable as damages, thus creating the risk that amount of recoverable damages could be significantly reduced during the course of the litigation.  In short, while Lead Plaintiff believes that the claims asserted in the Complaint have substantial merit, if the litigation continued, the Class would bear the risk of establishing liability in the face of numerous factual and legal issues that create considerable uncertainty.  By contrast, Lead Plaintiff has achieved a substantial Settlement that eliminates all of these risks.

    5.  **The Risks Of Establishing Damages**
        **Support Approval Of The Settlement**

   Even if Lead Plaintiff succeeded in establishing liability, it would face the significant risks inherent in proving and quantifying the damages suffered by the Class in this case.  In a Section 10(b) action, a plaintiff must prove the amount of damages based on "out-of-pocket" losses, which is measured by the difference between the fair value of what the plaintiff received and what would have been received if there was no fraudulent conduct.  *See In re Aetna*, 2001 WL 20928, at \*10; *In re Greenwich Pharm. Sec. Litig.*, Civ. A. No. 92-3071, 1995 WL 251293, at \*4 (E.D. Pa. Apr. 26, 1995).   The question whether Class Members suffered damages because of Defendants' misrepresentations, as opposed to external market conditions or other factors, would be the subject of sharp disagreement among the parties' respective experts.[6]  The reaction of a jury to such complex expert testimony is highly unpredictable.  *See Cendant*, 264 F.3d at 239; *Genta*, 2008 WL 2229843, at \*7; *Dominion Bridge*, 2007 WL 1101272, at \*5; *Corel*, 293 F.

---

[6]  Similarly, expert discovery and testimony also would have been required with respect to the determination of damages on the Securities Act claims.  While, with respect to those claims, the burden is on Defendants to establish that the losses suffered were caused by factors other than the alleged misconduct, Lead Plaintiff would have had to provide expert testimony to rebut Defendants' anticipated expert testimony regarding "negative causation."

Supp. 2d at 492; *Greenwich*, 1995 WL 251293, at *4; *SmithKline Beckman*, 751 F. Supp. at 529-30.  While Lead Plaintiff's damages expert would have opined on the measure of damages based on economic and legal theory that could withstand scrutiny, Defendants would have presented their own damages experts, with conflicting conclusions and theories.  Ultimately, proving damages would come down to a "battle of the experts," and it is impossible to predict which expert and theory of damages the jury would accept.  This unpredictability is avoided by the proposed Settlement.

6.    **The Risks Of Maintaining the Class Action Through Trial Support Approval Of The Settlement**

Lead Plaintiff believes that this case is appropriate for class treatment and would continue to be so through trial.  However, at the time Settlement was reached the Class had not yet been certified.  Moreover, the federal rules permit the class determination to be reviewed and modified at any time before trial.  *See* Fed. R. Civ. P. 23(c)(1); *In re Unisys Corp. Retiree Med. Benefits Litig.*, No. 969, 2003 WL 252106, at *2 (E.D. Pa. Feb. 4, 2003) (court is required to reassess the class ruling as the case develops and define, redefine, subclass and decertify as appropriate in response to the progression of the case); *In re Res. Am. Sec. Litig.*, 202 F.R.D. 177, 186 (E.D. Pa. 2001); *Kline v. Sec. Guards, Inc.*, 196 F.R.D. 261, 271 (E.D. Pa. 2000).  Thus, there always remains a risk that this Action may not have been able to be maintained on a class basis through trial.  Approval of the Settlement eliminates this risk.

7.    **Defendants' Inability To Withstand A Greater Judgment Supports Approval Of The Settlement**

Even if Lead Plaintiff were to overcome the foregoing risks and were successful in establishing liability and damages at trial, RAIT's financial condition and the extent of the Company's applicable insurance limited the amount that might have been recovered for the Class.  In connection with negotiating a settlement, Lead Plaintiff had to seriously consider the

15

possibility that RAIT would be unable to pay a judgment in the full amount that Lead Plaintiff would seek even if Lead Plaintiff were successful after trial and any appeals. *See* Lead Counsel Declaration ¶¶ 65-66. Where there is a possibility that the financial condition of a defendant would render it unable to withstand a greater judgment, this factor weighs heavily in favor of settlement. *See Am. Bus. Fin. Servs.*, 2008 WL 4974782, at *8 (where a larger judgment would risk "forcing the defendant to file bankruptcy," this factor "weighs heavily in favor of settlement"); *Dominion Bridge*, 2007 WL 1101272, at *6 (defendant's "[d]ire financial condition weighs heavily in favor of settlement"); *Ravisent*, 2005 WL 906361, at *9 ("There is clearly a substantial risk that Defendants would not be able to withstand a greater judgment, as Ravisent's financial fortunes never recovered after the end of the class period. . . . Therefore, this factor is in favor of settlement"); *Cell Pathways,* 2002 WL 31528573, at *4 (where it was "highly unlikely that [defendant] would have been able to pay, on its own or through its insurance, any judgment significantly larger than this settlement," this factor strongly supported approval of the settlement).

It was readily apparent by early 2009 that one of the primary risks faced by the Class was that RAIT had a very limited ability to pay any judgment that might be obtained. RAIT's stock price (which had traded as high as $38 per share during the Class Period) never recovered after the end of the Class Period and was trading at approximately $1.30 per share when the mediation began. *See* Lead Counsel Decl. ¶ 66. The collapse of the real estate market had placed RAIT's entire business model at risk. *See id.* Lead Counsel considered it a real possibility that, by the time the case proceeded to trial, RAIT would no longer exist or would not be in a position to pay a multi-million dollar judgment.

The need to reach a settlement in this Action as soon as possible was further underscored by the fact that the limited insurance proceeds available to fund a settlement were being depleted by the costs of litigation. *See* Lead Counsel Decl. ¶ 65. Had an agreement to settle not been reached, the vast majority, if not all, of insurance available to cover these claims would have been spent in defense of the action. *See In re SFBC Int'l Inc. Sec. & Derivative. Litig.*, 310 Fed. Appx. 556, 558 (3d Cir. 2009) (affirming district court's conclusion that it was "appropriate . . . to settle the case early while there were still substantial insurance proceeds which were available to the settlement"); *Am. Bus. Fin. Servs.*, 2008 WL 4974782, at *8 (approving settlement where "[c]ontinuing to trial in the hopes of obtaining a higher penalty would merely deplete the insurance policy proceeds . . . leaving the class, if successful, with a lesser judgment, not a greater one"); *Ravisent*, 2005 WL 906361, at *9; *In re Safety Components, Inc. Sec. Litig.*, 166 F. Supp. 2d 72, 91-92 (D.N.J. 2001). Against that possibility, the certain recovery of the $32 million cash Settlement was seen as a far superior result for the Class. These circumstances provide strong support for approval of the Settlement.

Notwithstanding these strong pressures in support of resolution of the Action, it took a full day of in-person mediation under the auspices of Judge Phillips, a highly respected mediator with extensive experience in the mediation of complex securities class actions, and weeks of extensive and detailed follow-up negotiations before Lead Plaintiff and Lead Counsel were satisfied with the terms of the proposed settlement and would agree to settle. The Settlement Amount, which represents roughly 33% of the Company's total current market capitalization (Lead Counsel Decl. ¶ 66), is an excellent result for the Class.

8.      **The Reasonableness Of The Settlement In Light Of The Best Possible Recovery And The Attendant Risks Of Litigation Support Approval Of The Settlement**

The final two *Girsh* factors are used to evaluate whether the settlement represents a good value for a relatively weak case or poor value for a strong case. The reasonableness of the settlement is considered in light of the best possible recovery and the risks the parties would face if the case went to trial. *See Prudential*, 148 F.3d at 322; *General Motors*, 55 F.3d at 806. As set forth in the Lead Counsel Declaration, the Settlement represents between 7-11% of the best reasonably expected damage award if Lead Plaintiff were to prevail at trial. *See* Lead Counsel Decl. ¶ 55. Courts have frequently found recoveries similar or less substantial than the current one to be within the range of reasonableness for settlement. *See, e.g., In re Rite Aid Corp. Sec. Litig.*, 146 F. Supp. 2d 706, 715 (E.D. Pa. 2001) (citing study showing that settlements of securities class actions "recovered between 5.5% and 6.2% of class members' estimated losses" on average, and approving settlement representing 9.65%); *Ikon*, 194 F.R.D. at 183-84 (approving settlement that obtained 5.2% of best possible recovery); *Greenwich*, 1995 WL 251293, at *5 (approving settlement that obtained 4.4% of estimated maximum damages); *see generally* Ellen M. Ryan & Laura E. Simmons, *Securities Class Action Settlements: 2008 Review and Analysis* at 6 (2009) (median settlement recovery in securities cases with estimated damages between $251 million and $500 million was 2.3% from 2000 through 2007 and 3.7% in 2008), *available at* http://securities.stanford.edu/Settlements/REVIEW_1995-2008/Settlements_ Through _12_2008. pdf.

The size of the settlement in light of the best possible recovery cannot be considered in isolation – instead, it must be juxtaposed against the likelihood of success in the litigation, including, as here, the various obstacles to establishing liability and damages and the real possibility that, by the time a trial verdict was reached some years in the future, RAIT would no

longer exist or would be unable to withstand a verdict substantially greater than the agreed-upon Settlement Amount. As the Court in *Dominion Bridge* explained, the "fact that a proposed settlement constitutes a relatively small percentage of the most optimistic estimate does not, in itself, weigh against the settlement; rather, the percentage should be considered in light of the strengths of the claims." 2007 WL 1101272, at *6 (quoting *Ikon*, 194 F.R.D. at 183-84).

The Settlement allows the Class to avoid the risks described above, and ensures a substantial and immediate payment to those members of the Class who submit valid claims. The Settlement represents a substantial cash payment that is clearly preferable to the very real possibility of no recovery at all under the circumstances of this case. *See Dominion Bridge*, 2007 WL 1101272, at *6 (size of proposed settlement in relation to most optimistic potential recovery is less relevant where defendant's dire financial situation would preclude a larger judgment); *Cell Pathways*, 2002 WL 31528573, at *6-*7 (same). The proposed Settlement is within the range of reasonableness and should be approved.

> ### E.    Based On The *Girsh* Factors And The Totality Of The Circumstances, The Settlement Is Fair, Reasonable And Adequate

The *Girsh* factors do not provide an exhaustive list of factors to be considered when reviewing a proposed settlement. *See Prudential*, 148 F.3d at 323; *Am. Bus. Fin. Servs.*, 2008 WL 4974782, at *5.

As discussed above, in determining whether a given settlement is reasonable, the opinion of experienced counsel is also entitled to considerable weight. *See Dominion Bridge*, 2007 WL 1101272, at *6; *Cullen*, 197 F.R.D. at 145; *Ikon*, 194 F.R.D. at 179. Lead Counsel believes that the Settlement represents an excellent result for the Class, in light of the litigation risks discussed above and the Company's precarious financial condition at the time of settlement. In addition, this Settlement was only achieved after protracted arms'-length negotiations and a full-day

mediation session before the Honorable Layn R. Phillips, a retired United States District Court Judge who has significant experience in mediating complicated securities class actions. *See* Lead Counsel Decl. ¶¶ 7, 56-60. The fact that the Settlement was achieved after extensive arms'-length negotiations between experienced counsel and that these negotiations were conducted with the assistance of an experienced and respected mediator, strongly supports the fairness and reasonableness of the agreed Settlement. *See In re Cmty. Bank of N. Va.*, MDL No. 1674, 2008 WL 3833271, at *10-*11 (W.D. Pa. Aug. 15, 2008) (use of a third-party mediator supported approval of the settlement); *Cigna*, 2007 WL 2071898, at *3 (the use of a retired federal judge as mediator helped establish the fairness of the settlement).

After fully exploring the strengths and weaknesses of Lead Plaintiff's case and the perils of continued litigation, Lead Counsel and Lead Plaintiff believe that the Settlement is the best possible outcome for the Class, is well within the required "range of reasonableness," and should be approved. Moreover, as noted above, more than 79,000 copies of the Notice, which sets forth the terms of the proposed Settlement, were mailed to potential Class Members and the Summary Notice was published in *The Wall Street Journal* and over the *PR Newswire* and not a single institutional investor member of the Class has objected to the proposed Settlement. *See* Lead Counsel Decl. ¶¶ 78-80. Lead Plaintiff respectfully submits that the proposed Settlement should be approved.

## III.    THE PROPOSED PLAN OF ALLOCATION SHOULD BE APPROVED

### A.    The General Standard For Approving A Plan Of Allocation

In determining whether to approve a proposed Plan of Allocation, "[t]he Court's principal obligation is simply to ensure that the fund distribution is fair and reasonable as to all participants in the fund." *Walsh v. Great Atl. & Pac. Tea Co.,* 726 F.2d 956, 964 (3d Cir. 1983). "In general, a plan of allocation that reimburses class members based on the type and extent of their injuries is

20

reasonable." *Ikon*, 194 F.R.D. at 184; *see In re Suprema Specialties, Inc. Sec. Litig.*, No. 02-168, 2008 WL 906254, at *7 (D.N.J. March 31, 2008); *In re Lucent Techs. Inc. Sec. Litig.*, 307 F. Supp. 2d 633, 649 (D.N.J. 2004) ("Courts have routinely approved plans of allocation that provide different payments to class members."); *Cell Pathways*, 2002 WL 31528573, at *7 ("Though each class member will not be allocated the same amount . . . the distribution is fair and equitable because each class member will receive a relative share based on factors directly related to their estimated losses."). In assessing whether a proposed plan of allocation is fair and reasonable, courts have afforded considerable weight to the opinion of experienced counsel. *See In re EVCI Career Colls. Holding Corp.*, No. 05 Civ 10240, 2007 WL 2230177, at *11 (S.D.N.Y. July 27, 2007) ("In determining whether a plan of allocation is fair, courts look primarily to the opinion of counsel."); *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 344 (S.D.N.Y. 2005) ("An allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel.") (citation omitted); *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 367 (S.D.N.Y. 2002) (same).

A "Plan of Allocation need not be, and cannot be, perfect;" *In re Cendant Corp. Sec. Litig.*, 109 F. Supp. 2d 235, 272 (D.N.J. 2000), *aff'd in relevant part*, 264 F.3d 201 (3d Cir. 2001). The plan of allocation does not need to be tailored to each class member's claims with "mathematical precision." *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 133 (S.D.N.Y.), *aff'd*, 117 F.3d 721 (2d Cir. 1997). On the contrary, "the general rule is that an allocation formula need only have a reasonable and rational basis." *In re Veeco Instruments, Inc. Sec. Litig.*, No. 05 MDL 01695, 2007 WL 4115809, at *13 (S.D.N.Y. Nov. 7, 2007); *see Maley*, 186 F. Supp. 2d at 367; *In re Am. Bank Note Holographics, Inc. Sec. Litig.*, 127 F. Supp. 2d 418, 429-30 (S.D.N.Y. 2001).

B.     **The Proposed Plan Of Allocation Is Fair And Reasonable
       And Warrants Approval By The Court**

The proposed Plan of Allocation is set forth in paragraphs 30 - 67 of the Notice.  Lead

Counsel developed the Plan of Allocation in close consultation with Lead Plaintiff's damages

expert and believes that the Plan of Allocation provides a fair and reasonable method to

equitably distribute the Net Settlement Fund among Authorized Claimants who suffered

economic losses as a result of the alleged violations of the securities laws.  *See* Lead Counsel

Decl. ¶ 83.

The proposed Plan allocates payments to Authorized Claimants on a *pro rata* basis based

on the relative size of each Authorized Claimant's Recognized Loss Amount.  The Recognized

Loss Amount depends on several factors, including when each Claimant purchased his, her or its

RAIT securities, whether those shares were held until the conclusion of the Class Period or sold

during the Class Period, and if so, when.  In general, the Recognized Loss Amount is based on the

declines in the prices of RAIT securities following corrective disclosures related to the alleged

fraud.  *See* Declaration of Jane D. Nettesheim ("Nettesheim Decl.") ¶¶ 10-16 (attached as Exhibit

4 to the Lead Counsel Declaration).

In sum, the Plan of Allocation attempts to fairly and rationally allocate the proceeds of the

Settlement among Authorized Claimants based on the strength of their claims and the relative size

of each Authorized Claimant's loss due to the alleged misstatements.  As such, the Plan of

Allocation, which was developed by experienced counsel in consultation with its damages expert,

is entirely consistent with plans that have been approved by other courts in this District and

elsewhere.  *See Ikon*, 194 F.R.D. at 184 (plan was reasonable where claimants were reimbursed

for their defined losses based largely on when they bought and sold stock and other adjustments

were made to reflect the strength or weakness of certain claims); *In re Datatec Sys., Inc. Sec.*

*Litig.*, No. 04-CV-525 (GEB), 2007 WL 4225828, at *5 (D.N.J. Nov. 28, 2007) ("plans that allocate money depending on the timing of purchases and sales of the securities at issue are common"); *Lucent*, 307 F. Supp. 2d at 649 (approving plan basing allocation on "estimated losses of the Class Members attributable to the alleged misstatements" which, "in turn, depend[ed] on the dates on which the stock was purchased and whether the stock was sold or held through the various alleged partial disclosures").

Furthermore, although more than 79,000 copies of the Notice were mailed to potential Class Members, not a single Class Member has objected to the proposed Plan of Allocation. The uniform approval of the Class provides additional strong support for approval of the Plan of Allocation. *See In re Ins. Brokerage Antitrust Litig.*, MDL No. 1663, 2009 WL 411877, at *9 (D.N.J. Feb. 17, 2009) ("in the absence of any substantive objections to the Plan, this Court concludes that the Plan satisfies the standard set forth in Fed. R. Civ. P. 23(e)"); *Lucent*, 307 F. Supp. 2d at 649 (where no objections were received, the court found that the "favorable reaction of the Class supports approval of the proposed Plan of Allocation"); *see also EVCI*, 2007 WL 2230177, at *11 (noting that courts "consider the reaction of a class to a plan of allocation" and holding that, where no objections were received, "[a]ccordingly, the Plan of Allocation should be approved").

## IV.    NOTICE TO THE CLASS SATISFIED THE REQUIREMENTS OF RULE 23 AND DUE PROCESS

In accordance with the Court's Preliminary Approval Order, beginning on September 25, 2009, the Court-approved Claims Administrator, The Garden City Group, Inc. ("GCG" or the "Claims Administrator") caused the approved Notice and Proof of Claim Form to be mailed by first class mail, postage prepaid, to potential Class Members. *See* Cirami Aff. ¶¶ 2-7. On October 7, 2009, the approved Summary Notice was published in *The Wall Street Journal* and over the *PR*

*Newswire*. *Id.* ¶ 8. The notice program, which combined an individual, mailed notice to all potential Class Members who could be reasonably identified, as well as to custodian holders, and a Summary Notice published in the nation's pre-eminent national business publication and over the internet, meets the requirements of Rule 23 of the Federal Rules of Civil Procedure, which calls for the "best notice practicable" under the circumstances, including individual notice to all members who can be identified through reasonable effort. *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974) (emphasis omitted); *Prudential*, 148 F.3d at 326-27. As these cases require, the Class has been given notice of the proposed Settlement and Plan of Allocation, as well as the rights of Class Members, and the method and dates by which they may object to the Settlement and proposed Plan, or opt-out of the Class. Further, the Class has been advised of the date of the final fairness hearing at which they will have an opportunity to be heard with respect to any objection raised.

## V.     CONCLUSION

For all the foregoing reasons, Lead Plaintiff respectfully requests that the Court approve the proposed Settlement as fair, reasonable and adequate; and approve the Plan of Allocation as fair and reasonable.

Dated:  December 3, 2009

Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER**
  **& GROSSMANN LLP**

By: /s/ Chad Johnson
Chad Johnson
Chad@blbglaw.com
Gerald H. Silk
John C. Browne
John Rizio-Hamilton
1285 Avenue of the Americas
New York, New York 10019
Tel: (212) 554-1400
Fax: (212) 554-1444

*Counsel for Lead Plaintiff Brahman Capital Corp.*
*and Court-Appointed Lead Counsel for the Class*

FINE, KAPLAN AND BLACK RPC
Roberta D. Liebenberg (PA ID # 31738)
rliebenberg@finekaplan.com
Ria C. Momblanco (PA ID # 201818)
rmomblanco@finekaplan.com
1835 Market Street, 28th Floor
Philadelphia, Pennsylvania 19103
Tel: (215) 567-6565
Fax: (215) 568-5872

*Liaison Counsel for Lead Plaintiff*
*Brahman Capital Corp. and the Class*

#418579